United States v. Gadsden. Mr. Ulrich. Your Honor. Good morning. Good morning. May it please the Court, my name is Frederick Ulrich. I'm an Assistant Federal Public Defender in the Middle District of Pennsylvania, and I represent the appellant, Brian Gadsden. I'd like to reserve two minutes of my time for review. Fine. As the Court knows, there's two issues in this case. The first concern is the propriety of the vehicle stop and seizure of Mr. Gadsden. At the time of the stop and seizure, the police or law enforcement authorities had the following information. They had a report from the day before of some threatening behavior in connection with the delivery of a package at an auto parts store that the proprietors later determined contained marijuana. They also had a generalized description of the individuals involved by racial profile. In other words, a bunch of black guys came in the store and made threatening remarks concerning this package. And maybe a woman. And maybe a woman. As many as five, as few as two. How many times did they come to the store? It's unclear from the record how many times they came in the store, but I think we can safely assume it was more than once. Yeah. And for a matter of minutes on each occasion. Apart from that. 20 pounds of marijuana. 20 pounds initially. Or 30 maybe, depending. It was a little light when they got it back. But the fact that it was. No, well, that's an interesting question. Because Mr. Matos opened the package. And then took it to his, was it his brother-in-law for safekeeping? That appears to be the case. That appears to be the case. And there is some reason to believe, and I don't know how much weight should be accorded to this reason, that 30 pounds had been shipped and 20 were found. And one wonders why neither Mr. Matos or Mrs. Matos testified at the suppression hearing. There may have been a finder's fee. I don't know about that. But in any event. No, no, that's a serious question. I'm not. Well, that is a serious. You have two officers who testified. Neither of them had any idea what was in the package. They didn't know. They were more concerned about the mailman. They didn't know about drugs. But it's interesting to me that Mr. Matos, who opened the package and apparently took it elsewhere for safekeeping, you'd think he would have taken it to the police once he opened it. One would think. But neither of them testified. That is correct. Indeed, in the second part of the. . . It's a little bit of a smell test thing operating here. What does. . . Although this is later in the argument, we would suggest that that poses some evidentiary problems, at least at our current state of review. But at least in terms of the initial issue, apart from the generalized racial profile and the fact that the auto parts store proprietor said these guys were either in a white minivan, a Jeep Cherokee, or a red Volvo, when the police arrive at the auto parts store, what they see across the street is my client, Mr. Gaston, seated in a vehicle, parked across and by the way down the street, his brother on a cell phone about 30 yards away. In a maroon Satcher. Burgundy, maroon. Burgundy, maroon. A different vehicle than the ones described. Described, yes. So what they don't have is a matching vehicle. And they also don't have any kind of particularized description. These guys have facial hair. What are they wearing? How old are they? How big are they? How tall are they? None of that was provided. But based on their proximity to the store and the generalized racial profile, the police then conduct a stop of the vehicle. Well, there's a couple other things, right? I mean, there's one officer that sees the passenger lean down, open the door in a way not to be observed, and he sees the other fellow slowly walk back to the car, and they take off. Well, they take off. I would suggest, and our position would be it's not flight, at least as it's commonly understood. And they do stop him some blocks away, and they take him into custody. I think, most candidly, the testimony from Detective Rivera sums up what happened. We got this case kind of turned around, he says. Normally, we got the information and we make the stop. Here we made the stop, and then we went ahead and got the information. The information, too, was that they were coming back, that whoever stopped in the auto store, the auto parts store, said they're coming back the next day. Yeah, that was the information. I'm going to ask the government about this, but I think it is somewhat interesting. Officer Rivera's testimony, we decided let's make the stop first, at least identify who they were, and then go to the shop and try to piece this together. And then I think we didn't know if they were innocent bystanders, and then the other officer stated he was hesitating in describing the basis on which they decided to stop because we got the case turned around. We stopped the people, and then the information started. Now, this is a little bit like, it reminded me a little bit of Rooster Cogburn in True Grit, shoot first, ask questions later. I mean, that's what it was. They stopped these men with really no reason to believe that they were involved, other than the fact they were black and parked across, and it could be as much as 30 yards away from an auto store. That's correct. That's it. Nothing else that I can say. And secondarily, the other issue in the case we think poses problems in addition, the due process violation associated with the show-up identification procedure. As a district court found, Mr. Gadsden, or actually Ms. Matos was initially told, hey, we got these two guys down the street here. We think they were involved. Why don't you come with us and take a look at them? At the time, Mr. Gadsden had been handcuffed, placed in the rear of a police cruiser, and when Ms. Matos is driven by, they pull him out of the police cruiser in handcuffs, surrounded by police, and ask him, hey, is this a guy? That procedure, as a district court found, was unnecessarily suggestive. She found it was suggestive, not unnecessarily suggestive. Well, the second part of that is whether there was some good explanation for failing to use a less suggestive procedure. What she also found was the government didn't present any testimony or argument on that point. And we believe, although they've now argued that there was some exigency that might have excused this. Go into the substantial risk of misidentification. There was a video, the videotape that was made, the surveillance tape in the auto store. Right? Correct. And your client was on it. Correct. And apparently, hearsay to be sure, because Ms. Matos didn't testify, he was in and out, your client, because he was identified on the video as being in and out. And Ms. Matos was the one who was there at the time. That's correct. So was there really a substantial risk of misidentification here? Well, I think there's actually two-part components to that. In the government's filing, and this is one of the things we would argue, what they say is, hey, look, we went back to the store, and sometime thereafter we took a look at the surveillance tape, and lo and behold, look, these guys match the guys that were in the store. And oh, and by the way, we went to the car, and here's this Cleveland Browns jersey that we found. I don't think you can use the Cleveland Browns stuff for purposes of the misidentification. But maybe you can use the video. I don't believe you can. Our position would be that this stuff is all corroborative evidence of guilt. The United States Supreme Court has said it's perfectly permissible that this case went to trial, and there was some challenge to the identification, and the jury still found the guy guilty, to come back and say, well, the verdict can be sustained because, by the way, the evidence of guilt was overwhelming, and this little error in terms of admitting this woman's identification was harmless. The videotape goes to Ms. Matos, what she saw. It goes not to the other evidence of guilt, the corroborating evidence of guilt, at least only, because it goes to the factors that have to be looked at for purposes of determining what the five factors that there is or is not a misidentification here. Our position would be that it doesn't necessarily go to what she saw. It may go to what she saw. If she testified at the evidentiary hearing on it, she may have corroborated the things on the videotape, but she didn't. She was there. She was under subpoena. She was in the hallway. She could have testified, but she didn't. So what we got is when we look at these five factors from Neils versus Biggers, we've got an opportunity to observe the person, but we don't know how she used that opportunity. And we look at the next factor, the degree of attention she paid to the suspects. Well, she didn't testify, so we don't know how much attention she paid to them. The degree of certainty associated with her identification. Again, she didn't testify. We don't know. So now we're left with the last two, the time between the identification and the incident. Well, this isn't a case like Brownlee or some of these other robbery cases or carjackings that occurred 20 minutes later. They bring the guy back and they say, oh, is this the guy that carjacked you or robbed you? No, it happened about 20 hours later. The day before was the incident. So the last thing we've got is the accuracy of her prior description. Well, the only thing she gave was a racial profile. In and of itself, in a normal course, that may not be troubling. You know, if there was a robbery, a purse snatching. But according to the government, she had plenty of opportunity to observe these people. How come she didn't notice the facial hair that Agent Corrado said was so important when he looked at the surveillance tape? How come she didn't notice the height and weight, which Agent Corrado said made it very easy to pick this guy out? How come she didn't notice the Cleveland Browns jersey? The reason we don't know is because she didn't testify, but we also know that what she did provide was entirely inconsistent and not nearly detailed enough. For these reasons, we would suggest that the court's order of suppression should be vacated and the matter remanded for further proceedings. Thank you very much, Mr. Overton. Mr. Consiglio? Good morning. Good morning. I'm Michael Consiglio on behalf of the United States. What happened to the other 10 pounds of marijuana, assuming there was another 10 pounds? And that's the question, whether you're assuming there's another 10 pounds of marijuana. I just think there may be a discrepancy between the way witnesses testified as to what they believed was the weight and what actual laboratory results came back. There very well may have been some skimmed off by Angelica Matos and family members who received that package, and we have no evidence to indicate whether it actually happened or didn't happen. You don't dispute that Mr. Matos opened the package, that instead of giving it to the cops or calling the postal authorities or anyone, he took it to I think it was the brother-in-law's house for safekeeping, quote, unquote. Right. Drove it down to Lancaster, shipped it from the box into a cooler. There was a variety of things they did. We're very curious. Very curious. Now, technically, a lot of these things did not come out at the suppression hearing, and I've picked through some of the other things that are outside the record of the suppression hearing itself. But it is a little troubling. For example, did she tell anybody before they went to stop the Gadsens that there was marijuana? They didn't know. The agents didn't know. The agents who did the stop did not know that there was marijuana in the package. Correct? I believe that's correct. The record's a little unclear on that point. Well, Corrado said we didn't know. Although when you read further into the record between what Detective Rivera says in combination with what Inspector Corrado says, it's not exactly clear whether they knew it. I believe they surmised that there was marijuana in the package. I think that's a fair statement from Rivera. There could have been something, but they didn't know it was marijuana. They were concerned because there was such attention paid to the package that people had gone in and out of the auto shop so many times that day that they were concerned about the, quote-unquote, threat to the mailman. For whatever purpose, would they want to intervene in this package unless it is something of value of that degree and quality? Why didn't the Maltoses testify? Well, obviously the record doesn't reflect the justifications for why the Maltoses didn't testify. It was a decision made at the suppression hearing, whether the record was sufficient at that time to win the hearing at that stage. You've really got a thin record here. You have got your agents saying that we really didn't know whether they're guilty, whether they're innocent, we didn't have any information. You know, shoot now and we'll find out later. Well, if we could talk about that further, I would like to, because I believe the record is fully sufficient evidence for the investigative detention. And the information provided may not have been clear that the package was full of marijuana when it was delivered, but the information was eminently cleared from the complainant who had reported it to the Postal Service that there were armed individuals between 2 and 5. No, no, don't get me wrong. And I don't disagree with you on that. Okay, I want to know, where was the reasonable suspicion that these two men, these two men in that burgundy maroon Saturn that day, 30 yards away from the auto shop, were the men who went into the store the day before? When these law enforcement officers received this complaint, they were looking for anywhere from two to five individuals, two of them, at least two of them being black men, who were casing the store the day before and were scheduled to return to the store to case that day. They respond to that store that day, and the vehicles described were a variety of cars which they changed, one of them being a four-door red sedan. Volvo. Volvo. And Judge Rambo decided, ruled, that there was a conflict. The direct question raised by the defense counsel was, you mean that's the four-door red Volvo? And the answer from the agent was, Volvo may have been one of the cars described, may have been a Volvo, was the finding of Judge Rambo. And I think then he said, yes, it was a Volvo. Okay. Yes. Well, at least they're looking for a variety of cars. Yes. You go to this location. None was a burgundy or maroon Saturn. Well, I'm not sure whether burgundy and red is a real clear distinction for cars. Either one. I'll take either one. You go to this location, and what are you expecting? The closest you've got is a red Volvo because you've got a Jeep Cherokee, which is, you know, a different kind of car, and you've got a white something, a Navigator or something, I don't know. And in light of the circumstances the way they described, they could have been in a variety of cars. But when you go to this location, what do these officers see? They see two black men across the street from the store watching the store, watching them. Across the street adjacent was defined in the record as 30 yards. Could be 30 yards. That's 90 feet. So I don't think we can say it was across the street. Well, the 30-yard description, I believe. It was down the street. I believe the 30-yard description also was at least it was describing where Reginald Gaston, the defendant's brother, was outside of the car. It was used adjacent, just as if it had been the same definite. Yes. Yes. So they were both described as. As adjacent. As adjacent. But adjacent was defined as as much as 90 feet away. Correct? It was described by the inspector as that, at least as far as the term that he used. Yes. The description from both officers was the car was across the street. And what happens at that point, which is significant, this isn't just two black males who happen to be at a location at the wrong time. This is two black males, one sitting in a car, another away from the car on a phone, watching the store. And then when they make their observation of these police officers show up in the description from the record, scream police. That I don't get. But if you see these cars, it is clear. And the judge made that point. The cars are wearing white socks or something. It's the same reaction you see when you're driving down the road and you look in the rearview mirror and you see a vehicle that may be a police car because you're going too fast. Is that a police car behind me? When you're in the city and when you know unmarked police cars, as a Chevy Caprice, under these circumstances, or a Crown Victoria, that is a detective car in this neighborhood. And that's just the screams police as described by the record. And when these individuals see them, their reaction is very telling. What do they do? Act very suspiciously, the defendant. For some reason, sneaks down into the seat, opens the door. Whether he reaches out is not clear from their observations at the time. But as it turns out, what he was doing was depositing a firearm. At least that's what connecting the dots from the record suggests. And what does Reginald Gadsden do? Upon seeing the officers, immediately walks back to the car, gets in, and starts to drive away. Now, expecting individuals to be casing an establishment. Expecting two black males to be there at that time when they see someone who, with all appearances, officers in unmarked vehicles responding to their institution, their reaction to them was indicative of the situation that was going to be described, that was described by the complainant. And under those circumstances, the officers reacted appropriately. And it wasn't shoot first and find out questions later. They had sufficient information under those circumstances to do an investigative detention. The only information they had was that there were black men involved, right? Yes. Period. Also that they would be at the store at this time and this location. Were they told they'd be at the store at this time, or just that they were expecting to return the next day? I mean, they went there to interview the mayors. They didn't go there to see if anybody's hanging outside. Yes. I'm overstating it when I say that time, but I mean by that day, that they were supposed to return the next day for the purpose of investigating further or casing further the establishment. And you use the word case. And I know when I was standing where you were, I would use the same word because you want us to believe they were casing it. But the only testimony there is one reference from each detective that they were looking essentially down the street at the store. Was that casing the place? I don't know. One was on the phone and he's looking. And is it surprising they were looking when you have these cars pull over? You know? I mean, I don't know. And as the United States Supreme Court found in Terry, there could be a very innocent explanation for all the conduct involved. But was it reasonable for the officers under those circumstances with that particular complaint coming in to connect those dots? And I respectfully submit that there was sufficient. Why don't you talk for a moment about the show-up under whether or not it's a violation of the 14th Amendment? I mean, it looks – I mean, you have conceded it was suggestive. Yes. And I think it was highly suggestive. Why was, though – talk about the second requirement, the substantial risk of misidentification here, given how suggestive that show-up was. And I'm not – and I don't want to concede that it was unnecessarily suggestive under the circumstances. No, I know. You haven't done that. Right. Just suggestive. Right. Now, the – with respect to whether the identification should proceed forward as far as the risk of misidentification is concerned, what we have here is we don't have an individual who observed someone for a very brief period of time. The record is clear, and the record has came through the law enforcement officers who testified at the proceeding about a videotape of this encounters. And the description is not of a five-minute fleeting contact, but this is hours of contact involving the individuals and our eyewitness, Angelica Matos. Would you agree with me, under Emanuel, you cannot use other evidence of the defendant's guilt to support the identification? That's correct, Your Honor. Yeah. That is correct. But the videotape, you think, can be used. I do. I do, because I believe it's corroborative evidence of the factors involved, the ability of the individual to identify him, the length of time, the lighting, the circumstances along those lines are clearly relevant from the video. And in light of those circumstances, the fact that Ms. Matos did not testify and actually bring out the other issues, such as her degree of certainty on the identification, is counterbalanced by the extent and breadth of her observation of these individuals. Although the other evidence connecting the defendants to this crime, as we indicated, is substantial. And in light of the totality of the circumstances, we believe her identification is not tainted by the assault that occurred and that it was necessary under the circumstances. There was, and although Judge Rambo indicates in her district court opinion that there was no direct evidence indicating a necessity, I believe the inferences that can arise from the record as it existed at the time is more than sufficient for this Court to find that it was necessary under the circumstances. You have armed individuals who have received a complaint or intent upon threats, intervening with government agents, as well as returning to the store for the victims involved in this case. In light of that circumstance, these officers did need to act quickly to identify or dispel for the liberty interests of Reginald and Brian Gadsden to release them quickly if they're the wrong people. And if they took time to take some of the other steps, there is a countervailing concern out there. If these are the wrong guys, if they don't act quickly and dispel it, there are right guys who are out there who are armed, who are intent upon taking action against other individuals. So they need to dispel the situation expeditiously, and this was an appropriate way to resolve it at that particular time. In light of the totality of the circumstances, we respectfully submit that this stop was a justified stop. They were aware of the complaint and the circumstances and the danger involved, and the exact description, with the exception of whether it was a Burgundy car, whether it was a Volvo or some other car, was exactly what they observed once they got there. When they got to the store. Black males? Two black males casing the establishment. And their reaction, and it's not – If they had simply stopped those individuals because they were sitting across the street, if they were just there across the street, that would be a much harder case for the government. But that's not what happened. We have these individuals, one in a car that's not operating, one sitting in a car for unknown reason, another 30 yards away, and talking, watching a store. And what do they do once they see what appears to be law enforcement? They react. And they react in response to what they see. And how do they react? They get out of there. They don't flee like ward law, where we have footlong flight. And I'm not suggesting that it's gone that far. But in the totality of the circumstances, they do react as if the circumstances in the complaint explicitly described they would. They got out of there. They got in the car without hesitation. The passenger, the defendant, opens the door, sluts down. The same time, Reginald Gadsden is moving from his location to the car because they both see what's across the street and both investigators involved. Once they see the reaction of the individuals, they confer about what's happening across the street because two individual law enforcement officers, Investigator Corrado and Detective Rivera, both saw the same thing at the same time. That reaction right there completes the picture that was just told us. Let's react. If I have any further questions. Any other questions? No. Good. Thank you, Mr. Considine. Thank you. Mr. Allwood. Just one point in rebuttal, and only with respect to the necessity argument, which may or may not detain the court. But in terms of the necessity or exigency argument, in this particular context and at this particular time, the government having failed to make that argument in their pre-hearing submission, having failed to develop evidence of it at the hearing, having failed to make an argument after the hearing, and having failed to make a post-submission filing on that issue, it's a little late in the day to now say that there's an exigency. It poses a problem simply because, at the time, somebody could have simply cross-examined the officers on whether there really indeed was an exigency, as opposed to surmising that there was. And our position would be that any argument on that point at this date and at this juncture is waived. Thank you, Your Honor. Thank you very much. The case was very well argued. We'll take the matter under advisement.